IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

HUMANSCALE CORP.,

      Plaintiff/Counterclaim Defendant,

   v.

COMPX INTERNATIONAL INC. and
WATERLOO FURNITURE COMPONENTS
LTD.,

      Defendants/Counterclaim Plaintiffs.

Action No. 3:09–CV–86

## MEMORANDUM OPINION

This matter is before the Court on several post-trial motions filed by Humanscale Corporation. After finding itself on the wrong end of a jury verdict, Humanscale has filed a (1) Renewed Motion for Judgment as a Matter of Law ("JMOL") on Noninfringement or, in the Alternative, Motion for New Trial (Dock. No. 276); (2) Motion to Alter Judgment or for New Trial on Inventorship, Equitable Estoppel, Inequitable Conduct, and Damages (Dock. No. 278); (3) Renewed Motion for JMOL on Invalidity or, in the Alternative, Motion for New Trial (Dock. No. 280); and (4) Combined Motion for Entry of Judgment and Findings of Facts and Conclusions of Law on Laches, and in the Alternative, for JMOL on Laches (Dock. No. 283). For the reasons detailed below, the Court DENIES the Motions.

## I. PROCEDURAL BACKGROUND

In February 2009, Humanscale Corp. initiated this suit when it filed a Complaint against CompX International Inc. and CompX Waterloo (collectively "CompX") regarding Humanscale's U.S. Patent No. 5,292,097 ("the '097 Patent"). In March, CompX filed a

counterclaim, alleging that Humanscale infringes on two of CompX's patents, specifically U.S. Patent Nos. 5,037,054 ("the '054 Patent") and 5,257,767 ("the '767 Patent") (collectively "CompX Patents").  By order of this Court, Humanscale's suit regarding the '097 Patent was stayed pending an investigation by the International Trade Commission. CompX's counterclaims regarding the CompX Patents, however, were not stayed.

After a seven day trial, the jury returned a verdict on February 25, 2010 in favor of CompX, finding that Humanscale Models KM, DS, 2G, 2C, 3G, 3C, 4G, 4G-AD, 5G, 5G-SM (collectively "Infringing Products") infringed CompX's '054 and '767 Patents (Dock. No. 249).  The jury awarded CompX $19,372,500 in past damages, which consists of an award of $17,220,000 for Humanscale's infringement from March 27, 2003 until March 27, 2009 and $2,152,500 for Humanscale's infringement from March 27, 2009 until December 31, 2009.  The jury also determined that CompX should receive a reasonable royalty rate of 6% for Humanscale's sales of the Infringing Products from January 1, 2010 until the expiration of the CompX's Patents on June 13, 2010.  The jury explicitly concluded that (1) neither of CompX's Patents were invalid as obvious; (2) there was no on-sale bar for CompX's Patents; (3) CompX had not unreasonably delayed, without justification, in pursuing its suit against Humanscale; and (4) Humanscale had not suffered any economic or evidentiary prejudice as a result of any delay.

Based on that verdict, Humanscale has filed the instant Motions.

## II. LEGAL STANDARDS

### A. Judgment as a Matter of Law

A district court may grant a motion for judgment as a matter of law if "there is no

legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."

GSM Dealer Servs., Inc. v. Chrysler Corp., 32 F.3d 139, 142 (4th Cir. 1994) (quoting Fed. R.

Civ. P. 50(a)). Under Rule 50, the court must examine the evidence in the light most

favorable to the nonmoving party and ascertain "whether a reasonable trier of fact could

draw only one conclusion from the evidence." Id. (quoting Townley v. Norfolk & W. Ry.,

887 F.2d 498, 499 (4th Cir. 1989)). The motion should be granted if the nonmoving party

failed to make a showing on an essential element of its case with respect to which it had the

burden of proof. Price v. City of Charlotte, 93 F.3d 1241, 1249 (4th Cir. 1996). As long as a

party moved for judgment as a matter of law on an issue prior to the case going to the jury,

then it may renew its JMOL on that issue after the trial and may also include an alternate

request for a new trial. Fed. R. Civ. P. 50(b).

## B. Motion to Alter Judgment or for New Trial

A motion to alter judgment under Rule 59(e) of the Federal Rules of Civil Procedure

is considered to be "an extraordinary remedy that should be used sparingly." Pac. Ins. Co.

v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998) (citation omitted). Importantly,

the rule should not be used to "relitigate old matters, or to raise arguments or present

evidence that could have been raised prior to entry of judgment," or "if it would serve no

useful purpose." 11 Charles Allen Wright, Arthur R. Miller and Mary Kay Kane, Federal

Practice and Procedure § 2810.1, at 127-28 (2d ed. 1995). In this circuit, it is well

established that a Rule 59(e) motion may only be granted: "(1) to accommodate an

intervening change in controlling law; (2) to account for new evidence not available at trial;

or (3) to correct a clear error of law or prevent manifest injustice." United States ex rel.

Becker v. Westinghouse Savannah River Co., 305 F.3d 284, 290 (4th Cir. 2002) (citation omitted).

A district court may set aside a jury's verdict and grant a new trial under Federal Rule of Civil Procedure 59(a) only if the verdict (1) is against the clear weight of the evidence, (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice. Lovell v. BBNT Solutions, LLC, 295 F. Supp. 2d 611, 617-18 (E.D. Va. 2003) (citing Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996)). The grant or denial of a motion for a new trial is entrusted to the sound discretion of the district court and will be reversed on appeal only upon a showing of an abuse of discretion. Atlas Food, 99 F.3d at 594.

## III. DISCUSSION

### A. Renewed Motion for JMOL on Noninfringement or, in the Alternative, Motion for New Trial

CompX presented the jury with two reasons why it asserted the Humanscale patents infringed CompX's patents: the accused products' platforms tilt upward when moved to a storage position like the CompX Patents and the accused products have unequal non-parallel connecting linkage arms like the CompX Patents. In renewing its motion for judgment as a matter of law, Humanscale now argues that the jury's conclusion of infringement conflicts with Federal Circuit law and is not supported by the evidence.

As to CompX's argument that the accused products infringed by tilting when moved to a storage position, Humanscale says that by not construing the word "tilting" in the claim language, the Court impermissibly allowed the jury to define a disputed term. Humanscale observes that in O2 Micro Int'l Ltd. v. Beyond Innovation Tech., Co., the Federal Circuit

stated that "[w]hen the parties raise an actual dispute regarding the proper scope of [the patent] claims, the court, not the jury, must resolve that dispute."  521 F.3d 1351, 1360 (Fed. Cir. 2008).  In Humanscale's view, there was a clear dispute over this term, with it wanting the term defined in a way that required any "tilting" to mean tilting that increased knee room under a desk, and CompX allegedly asserting that any magnitude of tilt would fall within the confines of CompX's patents.

Turning to the claim language, the "tilting" limitation of claim 1 of the '054 Patent states:

> a second connecting arm between the lower pivots whereby the arms and pivots provide a non-parallel, unequal connecting linkages between the pivots, said arms defining means for <u>tilting the platform to a non-horizontal position in the kneehole under a desk top as the platform is moved by pivoting of the arms to the retracted position</u>.

Similarly, the "tilting" limitation in claim 4 of the '767 Patent states:

> a second linkage arm between the first and second lower pivots, said first and second linkage arms having different lengths, whereby the linkage arms and pivots provide unequal non-parallelogram connecting linkages between the pivots, said arms defining means for <u>tilting the platform from a horizontal orientation to a non-horizontal orientation as the platform is moved by the pivoting of the linkage arms</u>.

In the Claim Construction Order, the Court concluded that the underlined portions of the above claims did not need to be construed and thus gave them their ordinary meaning as understood by a person experienced in the field of art at the time of the invention.  (Dock. No. 68, at 4-5.)  For several reasons, that decision was correct.

First, the Court disagrees that there was, or is, a dispute over the definition of "tilting" that required any construction.  In line with the specification and prosecution history, neither Humanscale or CompX ever contended that any tilt, no matter how

5

minimal, fell within the confines of the CompX Patents.  Humanscale may have initially offered various definitions that included certain degrees of tilt in the proposed definition, however, it eventually abandoned those arguments.  Humanscale stated at the <u>Markman</u> hearing that as to the definition of tilt, "[w]e are not trying to quantify it.  There is no support in the specification or the Prosecution History for a numerical quantification." (<u>Markman</u> Hearing, 10/13/09, at 76:17-19.)

Humanscale's most recent argument is that the definition of "tilting" must include a reference to increased knee room, or, at a minimum, tilting that goes beyond a generally horizontal position.  Although on the surface it appears that Humanscale has continued to maintain that no numerical qualification is appropriate, this new proposed construction begs the question—how then should the Court have defined what it means to "increase knee space."   How many degrees tilt would be required, or how many centimeters space would be necessary?  So, it seems, we again find ourselves confronting the unpersuasive argument that "tilting" must be defined in some way that includes a specific amount of tilt, an argument that Humanscale has already discarded.  The argument's new wrapping doesn't change its lack of force.

As the Federal Circuit established in <u>Phillips</u>, a claim's ordinary meaning may be overcome only if the specification reveals a special definition given to a claim term by the patentee that differs from the ordinary meaning it would otherwise possess.  <u>See</u> <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1316 (Fed. Cir. 2005).  It follows that even under <u>O2 Micro</u>, not all terms in a patent need to be construed by the court.  Allowing the jury to give"tilting" its ordinary meaning in light of the prosecution history and specification is not the same as

allowing the jury to arbitrarily give a disputed term its own meaning.  See U.S. Surgical

Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997) (concluding that a "trial judge

[need not] repeat or restate every claim term in order to comply with the ruling that claim

construction is for the court. . . .  [as] [i]t is not an obligatory exercise in redundancy").  In

sum, "tilting" did not need construction at the Markman stage or even as the case

developed as it has.

Second, even if the Court were to grant Humanscale the lifeline it seeks, the outcome

of this case would not suddenly tilt in Humanscale's favor.  Viewed in the light most

favorable to CompX, the jury had in hand sufficient evidence to permit it to conclude that

the accused patents infringe the CompX Patents beyond any design tolerances.  CompX's

expert, Dr. Wood, testified that the tilt present in Humanscale's devices were designed in to

the devices and were significantly larger than the expected design tolerance of $0.6337°$

that Humanscale's Dr. Pratt suggested.  (Trial Tr. 632:2-18.)  Humanscale's Scott Barry and

Dr. Pratt  and CompX's Dr. Wood each provided testimony on the tilting of the accused

devices, which provided sufficient evidentiary support for the jury's decision, whether

Humanscale's argument on the definition of tilting is accepted or not.

The Court rejects Humanscale's assertion that CompX only obtained this evidence

by impermissibly altering the devices with a weight.  The devices were measured under the

conditions for which they were designed to be used.  Furthermore, Humanscale tested the

products in the same way and at this point has waived the right to object to this issue.

As a second basis for infringement, CompX argued that the accused devices

infringed CompX's patents by also having "unequal non-parallelogram connecting

linkages." The Court construed this claim to mean that the devices's pivots are not adjustable between parallel and non-parallel configurations. Humanscale says its devices do not infringe that claim because its support mechanisms can be placed in a parallel configuration. While the Court agrees that some of the accused devices can be conformed into non-infringing positions, they can also be placed in infringing positions. Part-time infringement, however, is not a recognized patent defense. Bell Comm. Research, Inc. v. Vitalink Comm. Corp., 55 F.3d 615, 623 (Fed. Cir. 1995).

## C.  Renewed Motion for JMOL on Invalidity or, in the Alternative, Motion for New Trial

Humanscale asserts that CompX's patents are invalid under 35 U.S.C. § 103 as obvious and § 102(b) due to an on-sale bar. Each issue is discussed in turn below.

### 1.  Obviousness

Humanscale argues that the independent claims as well as some of the dependent claims in the '054 and '767 Patents are obvious. A patent may not be obtained where the subject matter of the claim is obvious at the time the invention was made to a person having ordinary skill in the art. 35 U.S.C. § 103(a). The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. KSR Intern. Co. v. Teleflex Inc., 550 U.S. 398, 416 (2007). A person of ordinary skill is a person of ordinary creativity, neither an automaton nor a genius. Id. at 421.

The Supreme Court has enumerated four factors courts should consider when assessing whether an invention is obvious: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter

and the prior art; and (4) secondary considerations, or "objective indicia of non-obviousness." Takeda v. Alphapharm Pty., Ltd., 492 F.3d 1350, 1356-57 (Fed. Cir. 2007) (citing Graham v. John Deere Co., 383 U.S. 1, 17-18, (1966)).  The fourth Graham factor instructs courts to consider the circumstances surrounding the invention process including, but not limited to: (1) meeting a long-felt need; (2) the inventors' success despite the failure of others; (3) commercial success; (4) copying; (5) praise and recognition for the invention; (6) unexpected results; and (7) significant effort and serendipity.  See Ruiz v. A.B. Chance Co., 234 F.3d 654, 660-62 (Fed. Cir. 2000).

A finding of obviousness may be defeated "by showing that the prior art teaches away from the claimed invention in any material respect." In re Peterson, 315 F.3d 1325, 1331 (Fed. Cir. 2003).  On this issue, the Federal Circuit has provided that:

> A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.  The degree of teaching away will of course depend on the particular facts; in general, a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant.

In re Gurley, 27 F.3d 551, 553 (Fed. Cir. 1994).  Further, "obviousness must be determined in light of all the facts, and there is no rule that a single reference that teaches away will mandate a finding of nonobviousness." Medichem, S.A. v. Rolabo, S.L., 437 F.3d 1157, 1165 (Fed. Cir. 2006).

In this case, the jury determined that Humanscale had not proven by clear and convincing evidence that claims 1, 5, or 8 of the '054 Patent or claims 4 or 13 of the '767 Patent are invalid.  Obviousness is a question of law based on factual underpinnings.

Graham, 383 U.S. at 17.  When the parties dispute the underlying facts, the issue of obviousness typically is submitted to the jury, as it was in this case.  See Jurgens v. McKasy, 927 F.2d 1552, 1557 (Fed. Cir. 1991).  When a party has properly preserved its right to renew its JMOL motion on obviousness, the court must first review the underlying factual findings, whether explicitly made by special verdict or presumed as necessary to support the jury verdict, to ascertain whether they are supported by substantial evidence.[1]  See Upjohn Co. v. Mova Pharm. Corp., 225 F.3d 1306, 1310 (Fed. Cir. 2000).  Then the court must independently review the legal conclusion on obviousness based on those factual findings.  Id.  Applying that framework, the Court finds that the jury's decision to reject Humanscale's obviousness argument and the presumed findings of fact necessary to that conclusion were rational and based on substantial evidence.

First, as to the scope and content of the prior art, the parties agree that the '798 Patent (Haworth) and CompX 4100 Series disclose every limitation of the independent claims of the patents-in-suit except for the final limitation requiring a non-parallelogram linkage.  Thus, the parties focused their energies on whether it was obvious to implement a non-parallelogram linkage in the 4100 Series or Haworth device.  On that issue, the jury heard substantial evidence that a person of ordinary skill would not have been motivated to modify the 4100 Series or Haworth device to include the non-parallelogram linkages found in the prior art, namely patents for a sewing machine support (the Aeschliman

---

[1] There is some dispute here as to whether Humanscale is now for the first time making its obviousness argument on the basis of a single prior art reference. To the extent it is doing do, the Court agrees with CompX that by not raising that argument previously, Humanscale may not raise it now.

patent), a typewriter support (the Lemon patent), and an ironer support (the Briggs patent), which are not directly relevant to the patents-in-suit.  Whether a motivation existed to modify a prior art reference and whether a reference in the prior art is "analogous" are questions of fact.  <u>Duro-Last, Inc. v. Custom Seal, Inc.</u>, 321 F.3d 1098, 1109 (Fed. Cir. 2003); <u>In re Clay</u>, 966 F.2d 656, 658 (Fed. Cir. 1992).  In rejecting Humanscale's invalidity argument, the jury, in this Court's view, would have been justified in concluding that there was no motivation to combine prior art references.  The jury heard that the prior art Humanscale offered came from other fields of endeavor and that each of the prior references either did not actually approach the room under the work platform as space for a user's knees or did not view tilting as a means to create more knee room.

Second, CompX presented evidence that the prior art Humanscale offered actually taught away from making the proposed combination.  CompX asserts that a person of ordinary skill would have been dissuaded from incorporating the non-parallelogram linkages of Lemon, Briggs, or Aeschliman into a keyboard support system because it would result in an inoperable device that would in some instances dump the keyboard and mouse on the ground.  Although this argument is not entirely persuasive because it is well-known that a person of ordinary skill would make necessary adjustments to the prior art, <u>see</u> <u>In re Icon Health and Fitness, Inc.</u>, 496 F.3d 1374, 1381-82 (Fed. Cir. 2007), CompX still presented some viable evidence that the nature of the prior art made Humanscale's proposed combinations difficult to conceive.  The jury heard this evidence and permissibly could have relied on it.

Lastly, the jury heard evidence that various secondary considerations suggested

that the patents-in-suit were not obvious.  Dr. Wood observed that the need to improve knee room was long felt, but unsolved prior to the claimed invention.  This conclusion, the jury could have found, was further supported by the increase in sales that occurred when the patented invention was introduced into the marketplace.  True, CompX conducted no survey asking consumers if they bought the devices employing the patents-in-suit because of the improved knee room, however, it did offer sales figures demonstrating that the 6100 Series obtained immediate and substantial economic success over CompX's prior devices.

Humanscale also seeks to invalidate some of the dependent claims of the patents-in-suit.  Claim 5 of the '054 Patent states "the support mechanism of claim 1 including vertical pivot axis connecting between the mounting plate bracket and the mounting plate."  Humanscale believes that both the Haworth Patent and the CompX 4100 Series disclose a vertical pivot axis connecting between the mounting plate bracket and the mounting plate.  Claim 8 of the '054 Patent and claim 13 of the '767 Patent recite:

> wherein the first connecting arms comprised a pair of parallel arms spaced one from the other by a connecting planar plate and further including the spiral spring means having one end biased against the plate and other end biased against the support bracket for the plate to bias the first connecting arms toward the extended position.

Humanscale claims that each of these elements appears in prior art.  Haworth and the 4100 Series disclose, according to Humanscale, a pair of parallel arms spaced one from the other by a connecting planar plate and both employed extension springs to bias the linkage arms and platform to an extended position.  Humanscale then claims the Aeschliman Patent discloses a torsion spring, the type used in the patents-in-suit, biasing against a connecting rod spanning between a pair of parallel linkage arms to bias the non-parallelogram linkage

and associated platform toward an extended position.  One of ordinary skill in the art would have been motivated to try using a torsion spring to bias the Haworth or CompX 4100 Series because, Humanscale says, torsion springs were known to work in biasing a non-parallelogram linkage upwards and torsion springs cost less than extension springs.

The jury, however, disagreed with Humanscale's interpretation of the prior art and the Court finds no error in that choice.  The jury could have accepted CompX's assertions that the spring placement in the prior art is in a different location and moving it would not have achieved the desired results.  The jury was also within its prerogative to discount Humanscale's expert Dr. Pratt on this matter because he expressed some unfamiliarity with the prior art relied on by Humanscale.  (Trial Tr. 664:22-24, 670:3-13.)

### 2. On-Sale Bar

Humanscale next contends that trial testimony and record evidence establishes that the patents-in-suit are invalid under 35 U.S.C. § 102(b), which creates a statutory bar to the patenting of any alleged invention that was offered for sale in the United States more than one year prior to the patent application.  In this case, CompX's date of application is June 13, 1990, making the "critical date" June 13, 1989.  At trial, Humanscale asserted that the CompX Patents were offered for sale at least twice before the critical date.  Proof of the first offer for sale, Humanscale believes, comes from the testimony of Dale McConnell, who was CompX's National Sales Manager in the United States in 1989.  McConnell previously stated that the first sales of the 6100 Series, which practiced the patents-in-suit, occurred in "mid-1988 or early 1989."  Although he was unsure of the exact date within that range, Humanscale says he was not unsure about the range.  With that range establishing the first

13

sale, Humanscale notes that the first _offer_ for sale must have occurred earlier. Humanscale asserts that proof of another sale comes from the minutes of a mid-July 1989 CompX Board of Director meeting which states that "Westinghouse has approved this arm for their use. Shipments will start in mid-July." Corey Boland testified, according to Humanscale, that with the expected lead time of four to six weeks between selling and shipping a product, those sales to Westinghouse would have likely occurred in early to mid-June 1989, with offers for sale necessarily occurring earlier.

Lastly, as Humanscale suggests, the on-sale bar also requires that the device be ready for patenting at the time of the first sale or offer for sale. In Humanscale's view, an internal memorandum by McConnell on February 14, 1989 states that a sample of the 6100 product previously sent to him had the basic features of the product eventually sold on the market. Also, Humanscale states that the 6100 Series had been put through industry testing, suggesting that it was ready for the market. Thus, Humanscale says CompX's Patents are invalid due to an on-sale bar.

The jury rejected this defense and because substantial evidence supports that conclusion, the Court will deny Humanscale's Motion on this issue. McConnell testified that sales began in the third quarter of 1989, which is after the critical date, and his prior deposition testimony only showed that McConnell believed that he needed to look at the sales records to determine when sales began. The Board of Directors meeting document stating that Westinghouse agreed to purchase the 6100 series with shipments beginning "mid-July" needed some additional evidence to support the conclusion that a sale or offer for sale had occurred before the critical date. No such evidence was introduced. No

testimony established how long of a lead time was required between selling and shipping in 1989. While Corey Boland stated that the current CompX lead time is four to six weeks, the Board of Directors document relied on by Humanscale does not compel the conclusion that the 6100 series was on sale or offered for sale prior to June 13, 1989. The Board of Directors document was produced on July 18, 1989 and it states that the products had not yet shipped, so even if the lead time of today is used for 1989, the sale would not have occurred prior to the critical date for any sale during the majority of the alleged lead time. Humanscale says offers for sale may, however, have occurred before that date. But, other credible testimony established that CompX does not offer its products for sale before the pre-production run and the specifications sheets are complete, which in this case was after the critical date on June 29, 1989. Based on this evidence, substantial evidence supports the jury's conclusion that Humanscale did not show by clear and convincing evidence that the patents-in-suit are invalid based on the on-sale bar.

**D.  Combined Motion for Entry of Judgment and Findings of Facts and Conclusions of Law on Laches, or in the Alternative, for JMOL on Laches**

### 1. Relevant Background

As should be evident by now, Humanscale and CompX compete in the keyboard support mechanisms market. That competition has produced consistent litigation between them as well as their predecessors. In 1997, Haworth, Inc., on CompX's behalf, sued Humanscale regarding U.S. Patent No. 4,616,798 ("the 798 Patent"). CompX had granted Haworth a license to market the '798 Patent and in exchange, Haworth agreed to, among other things, defend the '798 Patent against CompX competitors, such as Humanscale. This litigation lasted until March 2004, when Haworth finally settled with Humanscale. CompX,

however, was unhappy with the terms of the settlement and subsequently initiated suit against Haworth, which lasted until November 2006.

While the Haworth-Humanscale litigation heated up, CompX, in 1998, also sued Humanscale, asserting infringement of the '054 Patent and the '767 Patent—the same patents at issue in the present suit.[2]  The parties attempted to have the litigation stayed, however, the court rejected the proposal.  Thus, pursuant to Federal Rule of Civil Procedure 41, CompX voluntarily dismissed the case in January 2000.  The parties currently disagree over what prompted the dismissal.  CompX says that by agreement it dismissed the case to allow the Haworth-Humanscale litigation to progress and to allow reexamination of the '097 Patent, which took place from 2004 to 2008.  Humanscale says no agreement was ever reached.

No action related to the '054 and '767 Patents arose again until March 2009 when Humanscale initiated this suit against CompX regarding its U.S. Patent No. 5,292,097 ("the '097 Patent").  CompX then counterclaimed, asserting again as it did in 1998 that Humanscale was infringing the '054 and '767 Patents.  While this Court stayed Humanscale's suit regarding the '097 Patent pending an investigation by the International Trade Commission, CompX's counterclaims regarding the '054 and '076 Patents were not stayed.

## 2.  Analysis

Laches has long been recognized as an equitable defense in patent infringement

---

[2] This litigation involved predecessors of both companies.  See Waterloo Furniture Comp., Ltd. v. Soft View Computer Prod., Corp., et al., No. 98-cv-2396 (N.D. Ill. 1998).

litigation.  A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1028 (Fed. Cir. 1992).  To establish laches, a party must prove (1) an unreasonable and inexcusable delay in bringing suit and (2) material prejudice caused by the delay.  Id. at. 1032.  The length of time which may be deemed unreasonable has no fixed boundaries but rather depends on the circumstances.  Id.

Material prejudice—whether it be evidentiary or economic—to adverse parties resulting from the plaintiff's delay is essential to the laches defense.   Evidentiary, or "defense" prejudice, may arise by reason of a the accused infringer's inability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts.  Id. at 1033.

Economic prejudice may arise where a defendant will suffer the loss of monetary investments or incur damages which likely would have been prevented by an earlier suit. Id.  Courts must look to whether the defendant changed its economic position during the period of delay resulting in losses beyond those attributable to a finding of liability for infringement and whether an earlier suit would have avoided losses by allowing the defendant to switch to a non-infringing product.  Id.  The Federal Circuit has said "economic prejudice is not a simple concept but rather is likely to be a slippery issue to resolve."  Id.

A delay of more than six years after actual or constructive knowledge of the defendant's alleged infringing activity raises a presumption that the plaintiff's actions are unreasonable, inexcusable, and prejudicial.  Wanlass v. General Elec. Co., 148 F.3d 1334,

1337 (Fed. Cir. 1998); <u>Aukerman</u>, 960 F.2d at 1035-36. Once a presumption of laches arises, the plaintiff can attempt to rebut it by offering a sufficient quantum of evidence to put the existence of a presumed fact into genuine dispute. <u>Id.</u> Such evidence may be directed to showing either that the plaintiff's delay was reasonable or that the defendant suffered no prejudice or both. <u>Id.</u> at 1038. Once the minimum amount of evidence is produced, the presumption vanishes and the accused infringer is left to its proof with the presumption playing no role in the ultimate decision. <u>Id.</u> at 1037-38.

In evaluating a laches defense, a court must also consider and weigh any justification offered by the plaintiff for its delay. Valid excuses may include other litigation, negotiations with the accused, dispute over patent ownership, and extent of infringement. <u>Id.</u> at 1033. A plaintiff may also defeat a laches defense if the infringer has engaged in particularly egregious conduct which would change the equities significantly in plaintiff's favor. <u>Id.</u>

The laches defense must be proven by a preponderance of the evidence. <u>Id.</u> at 1045. If proven, the defense bars the plaintiff from recovering any damages that may have accrued prior to the suit. <u>Id.</u> at 1041. In the end, the application of laches is committed to the sound discretion of the district court. <u>Id.</u> at 1032.

Before getting to the heart of the matter, the parties raise several preliminary issues that must be resolved. First, CompX asks the Court to calculate a new laches period for each of Humanscale's products based on when that product was introduced into the market. The Court declines this invitation. A new laches period does not begin on a product-by-product basis if each of the later introduced products is the same or similar as

18

the initial product.  See Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F.3d 1279, 1294

(Fed. Cir. 2008); N. Telecom, Inc. v. Datapoint Corp., No. CA3-82-1039D, 1992 WL 131549,

at *16 n.4 (N.D. Tex. June 4, 1992) ("[Plaintiff] posits that Datapoint, by expanding its

business and introducing new products over the years, triggered a new laches period with

each infringing product. . . .  [T]he court . . . concludes Datapoint's conduct did not

sufficiently change over time so as to instigate [a] new laches periods.").  In this case, the

evidence established that the later introduced products were similar to the initial keyboard

support product and, as a result, no new laches period began.

Next, the parties debate the applicability and strength of the presumption.  CompX

alleges that due to the complex nature of the testing required to determine if Humanscale's

products infringe the CompX Patents, it did not have actual or constructive notice of the

accused products.  The evidence at trial, however, suggests otherwise.  To test for

infringement, the experts hired in this dispute used a table, the products, and a level,

belying CompX's reach for some element of complexity.  The evidence also supports the

conclusion that CompX was well-aware, or at least should have been, of the accused

products, especially after the 1998 litigation between these parties concerning the same

patents at issue now.  Humanscale sold the accused products openly on the market and

CompX observed Humanscale products at industry trade shows.  Nevertheless, while the

presumption applies here, CompX, by offering a sufficient amount of evidence to call into

question each of the elements of laches, has rebutted the presumption.  Without it,

Humanscale is therefore left to its proof on this issue.

### a.  Whether the delay was unreasonable and inexcusable

As to the first element of laches, the issue here is whether the various excuses CompX offers justifies its nine year delay.  The length of time that is unreasonable or inexcusable in filing suit depends on the facts of each case, with the focus throughout remaining on reasonableness.  <u>Gasser Chair Co.</u>, 60 F.3d at 773-74.  In directing courts to "consider and weigh <u>any justification</u> offered by the plaintiff for its delay," the <u>Aukerman</u> court stated:

> Excuses which have been recognized in some instances, and we do not mean this list to be exhaustive, include: other litigation; negotiations with the accused; possibly poverty and illness under limited circumstances; wartime conditions; extent of infringement; and dispute over ownership of the patent. The equities may or may not require that the plaintiff communicate its reasons for delay to the defendant.

960 F.3d at 1033 (internal citations omitted) (emphasis added).  Here, the delay spans from 2000, when CompX voluntarily dismissed its case against Humanscale, until it filed its counterclaims in this case in 2009.  CompX asserts that the parties agreed to delay the suit on the patents-in-suit until the CompX-Humanscale litigation and the re-examination of Humanscale's '097 Patent had concluded.  CompX adds that even if there was no agreement, the delay involved "other litigation" that justifies its delay.

First, as to CompX's assertion that the parties agreed to a stay that justifies all or a portion of the delay in this case, the Court finds that the record fails to support any such agreement.  Although the parties may have wanted and tried to enter into a stay that lasted until the Haworth-Humanscale litigation ended or a 120 day stay, both of those suggestions were rejected by the district court in the 1998 litigation.  Now to suggest that the former stay should apply whereas the latter should not has no evidentiary or logical support.  Only Humanscale CEO Robert King testified as having been involved when the parties negotiated

the 1998 dispute and he stated that no stay agreement was accepted by the parties once the court rejected their proposal. These sophisticated parties would surely have written down this agreement if it in fact existed. Am. Home Prods., Corp. v. Lockwood Mfg., Co., 483 F.2d 1120, 1123 (6th Cir. 1973) ("If there had been [an agreement to delay a suit], these corporate entities and their counsel were fully capable of writing an appropriate one-page letter."). Apart from statements made by CompX employees who were not involved in the prior litigation, CompX has offered no persuasive evidence to justify the delay based on an agreement of the parties. Moreover, logically, CompX's assertion that it would agree to cede complete control to Humanscale over when it could bring suit on the patents-in-suit completely contradicts CompX's repeated assertion at trial that it lives and dies by maintaining tight control over the use of its patents.

Next, the question remains whether even without an agreement, the period of delay is justified. The nine years can be broken down into three time periods: (1) from 2000-2004 the Haworth-Humanscale litigation was ongoing; (2) from 2004-2006 the CompX-Haworth litigation was ongoing; and (3) from 2004-2008 the re-examination of the '097 Patent was ongoing. As to the first period, the Haworth-Humanscale litigation did not involve CompX or the patents-in-suit, making it extremely difficult to accept CompX's position. CompX contends that the "other litigation" exception discussed in Aukerman need not pertain to the patents-in-suit or the patent holder as long as there is some reasonable justification. Although it is true that the Federal Circuit has stated that courts should consider "any justification" offered by a party and that laches is not made upon the application of "mechanical rules," Aukerman, 960 F.3d at 1032, accepting CompX's

argument here, even if it is true that CompX was paying for Haworth to litigate against Humanscale, would eviscerate the protection of laches. Additionally, to the extent CompX appeals to the "poverty" excuse because it would have been paying for multiple court battles, the Federal Circuit has stated that poverty may only be "considered as a factor where there is some [other] legally cognizable excuse for an unreasonable delay." Hall, 93 F.3d at 1554.

Moving on to the second period of delay from 2004-2006 during which time CompX and Haworth litigated whether Haworth's settlement with Humanscale violated CompX's licensing agreement with Haworth, the Court again observes that this contract dispute did not concern the patents-in-suit. Although the "other litigation" during this time period did involve CompX, it was not a patent litigation, thereby reducing any force it may have had to invoke the expensive, burdensome nature of patent litigation.

The third time period, from 2004-2008, involved Humanscale's re-examination of the '097 Patent. The re-exam did not involve the patents-in-suit or CompX. While it did involve a patent for a keyboard support mechanism, as the Haworth-Humanscale litigation did, that fact alone cannot justify the delay during this time period. See Serdarevic v. Advanced Medical Optics, Inc., 532 F.3d 1352, 1359 (Fed. Cir. 2008) ("In this case, the 'other litigation' excuse applied in Vaupel is inapplicable. It was the defendants-not [plaintiff]-that were engaged in reexamination proceedings before the PTO."). Waiting until the re-exam was over in fact increased CompX's chances of having to confront two patent litigations at one time. Of course the '097 Patent litigation has been stayed, relieving CompX of that burden, but it did not know that when it brought its counterclaims

that are the foundation of the instant case. Moreover, CompX has not offered any persuasive reason why the re-examination of the '097 Patent would alter in any way the course of the instant suit. See id. at 1360 ("Here, there is nothing in the record to suggest that [plaintiff]'s inventorship claim arose during the re-examination proceedings or changed in any material way over the course thereof.").

Apart from the deficiencies cited above, CompX also faces the difficulty of showing that it in some way gave notice to Humanscale about its plans to assert its patent rights after the other litigation ended. The Federal Circuit has stated that "[f]or other litigation to excuse a delay in bringing suit, there must be adequate notice of the proceedings to the accused infringer." Vaupel Testilmaschinen KG v. Meccanica Euro Italia S.P.A., 944 F.2d 870, 877 (Fed. Cir. 1991). Like the application of laches in general, courts have been admonished not to mechanically impose a notice requirement. Thus, the question is whether Humanscale had reason to know it would be sued again, not necessarily whether CompX is the one that gave Humanscale notice. Id. at 878. ("Our decision in Hottel does not require that notice of other litigation and of a patentee's intent to sue after that other litigation is terminated be expressly stated in writing. What is important is whether [defendant] had reason to believe it was likely to be sued."); Hemstreet v. Computer Sys. Entry Corp., 972 F.2d 1290, 1293 (Fed. Cir. 1992) ("Aukerman has clarified that [notice] is far from a hard and fast requirement.") CompX is correct that the 1998 suit between CompX and Humanscale was dismissed without prejudice, but it is difficult to then conclude from that fact alone that Humanscale was on actual or constructive notice nine years later that CompX would likely sue again over the patents-in-suit. Besides that rather

weak assertion of notice, the record does not indicate that Humanscale was given any other notification that it may be sued in the future in connection with the McConnell Patents. Based on those findings, the Court holds that Humanscale has shown by a preponderance of the evidence that the delay in this case was inexcusable and unreasonable and thus has met its burden for the first element of laches.

### ii.  Whether Humanscale suffered prejudice as a result of the delay

### a. Evidentiary Prejudice

Humanscale contends that it suffered evidentiary prejudice in connection with its inventorship, inequitable conduct, and on-sale bar defenses.  Although, as explained below, the Court will deny Humanscale's Motion for Reconsideration of its Inventorship, Equitable Estoppel, and Inequitable Conduct Defenses, infra, the Court rejects Humanscale's claims that it suffered evidentiary prejudice in connection with its inventorship and inequitable conduct defenses.  Every unsuccessful defense does not automatically give rise to a successful claim for evidentiary prejudice.  Humanscale was able to present a full and fair defense with respect to these arguments, but was simply unable to prevail.  The only prejudice this caused, however, is the prejudice all litigants experience when an argument fails to persuade.

The more difficult question is whether Humanscale suffered evidentiary prejudice in connection with its on-sale bar defense.  Evidentiary prejudice may arise where the "defendant's ability to present a full and fair defense on the merits due to the loss of records, the death of a witness, or the unreliability of memories of long past events" undermines the Court's ability to judge facts.  Aukerman, 960 F.2d at 1033.  The prejudice

24

must occur during the period of delay.  Here, however, Humanscale comes up short on proving that any documents were lost or destroyed or memories faded during 2000 to 2009, the period of delay in this case.  CompX's Corey Boland testified that CompX likely had a seven year document retention policy, which would have resulted in certain documents from 1988 or '89 being destroyed in 1995 or '96.  Although Boland's testimony is not entirely persuasive because he did not work for CompX during that time and his testimony about the document retention policy appeared to be about the policy that existed in 2003, Humanscale is nevertheless the party that bears the burden of proving prejudice.  On this record, the Court concludes that Humanscale has not shown by a preponderance of the evidence that it suffered prejudice, not before, but during the period of delay.

### b. Economic Prejudice

Humanscale also maintains that it has suffered economic prejudice as a result of CompX's delay in bringing the instant suit.  "Economic prejudice may arise where a defendant will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit." Aukerman, 960 F.2d at 1033.  Expenditures and investments must have a "nexus" to the patentee's delay in filing suit.  Hemstreet, 972 F.2d at 1294.  "It is not enough that the alleged infringer changed his position-i.e., invested in production of the allegedly infringing device.  The change must be because of and as a result of the delay, not simply a business decision to capitalize on a market opportunity." Id.; see also Meyers v. Asics Corp., 974 F.2d 1304, 1308 (Fed. Cir. 1992) ("[L]aches does require that prejudice results from the delay.  As stated in Aukerman, there is a difference

between prejudice that results from delay and prejudice that is due to reliance upon delay.").  The Federal Circuit has observed that "economic prejudice is not a simple concept but rather is likely to be a slippery issue to resolve."  Aukerman, 960 F.2d at 1033.

Here, too, the Court concludes that because Humanscale was unable to demonstrate that it changed its economic position based on CompX's delay, it has not carried its burden of proving economic prejudice.  The record does not support the conclusion that Humanscale would have behaved any differently had CompX sued it earlier, because Humanscale has maintained since the earlier litigation involving the patents-in-suit in 1998 that CompX's patents were invalid or that its patents did not infringe CompX's patents.  Humanscale appears to have continued producing and selling the accused products based on its own legal and business judgment.  Its post-hoc assertions that it would have switched to a different line of products does not comport with its behavior since 1998, and thus, does not change the result.  The damages it now seeks to avoid are the economic damages merely attributable to a finding of infringement.  See id. ("[Economic] damages or monetary losses are not merely those attributable to a finding of liability for infringement.  Economic prejudice would then arise in every suit." (citation omitted)).  In sum, Humanscale has not shown it suffered economic or evidentiary prejudice and, accordingly, its Motion is DENIED.

## E. Combined Motion for Reconsideration of its Inventorship, Equitable Estoppel, and Inequitable Conduct Defenses, and Motion for a New Trial on Damages

### 1. Motion for Reconsideration

#### a. Legal Standard

Under Fed. R. Civ. P. 50(a), a "district court may grant a motion for judgment as a

matter of law during a jury trial after a party has been fully heard on an issue only if there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." Brown v. CSX Transp., Inc., 18 F.3d 245, 248 (4th Cir. 1994)(internal quotation and citation omitted). To grant the motion, the court must examine the evidence in the light most favorable to the non-moving party and determine "whether a reasonable trier of fact could draw only one conclusion from the evidence." Townley v. Norfolk & W. Ry., 887 F.2d 498, 499 (4th Cir. 1989). Here, the Court granted CompX's motion as to inequitable conduct and now Humanscale asks the Court to reconsider that prior interlocutory ruling. See 28 U.S.C. § 1291; see also Dortch v. Fowler, No. 05-cv-216, 2007 WL 2757139, at *3 (W.D. Ky. Sept. 20, 2007) (referring to grant of judgment as a matter of law as an interlocutory order); Pfizer, Inc. v. Stryker Corp., 385 F. Supp. 2d 380, 383 n.4 (S.D.N.Y. 2005) (same). Motions for reconsideration of interlocutory orders are not subject to the strict standards applied to motions for reconsideration of a final judgment under Federal Rule of Civil Procedure 60(b). Am. Canoe Ass'n. v. Murphy Farms, Inc., 326 F.3d 505, 514 (4th Cir. 2003) (citing 12 Moore's Federal Practice § 60.23). It is within the discretion of the court to reconsider and modify its interlocutory judgments at any time prior to final judgment when such is warranted. Id. at 514-15 (citing Moses H. Cone Mem. Hosp. v. Mercury Const. Corp., 460 U.S. 1, 12 (1983)). "Doctrines such as law of the case . . . have evolved as a means of guiding that discretion." Id. at 515. The Court is bound by earlier decisions of the case, which become "law of the case" unless: "(1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was

clearly erroneous and would work manifest injustice." Sejman v. Warner-Lambert Co., Inc., 845 F.2d 66, 69 (4th Cir. 1988) (internal quotation marks omitted).

**b. Analysis**

At trial, the Court granted CompX's motion for judgment as a matter of law on Humanscale's inequitable conduct, equitable estoppel, and inventorship defenses. Humanscale now asks that the Court to vacate that ruling in order to permit a jury to determine if Humanscale's evidence supports its defenses. Each issue is discussed below.

**i. Inequitable Conduct**

Applicants for patents and their legal representatives have a duty of candor, good faith, and honesty in their dealings with the United State Patent and Trademark Office ("PTO"). Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995); 37 C.F.R. § 1.56(a). The duty of candor, good faith, and honesty includes the duty to submit truthful information and the duty to disclose to the PTO information known to the patent applicants or their attorneys which is material to the examination of the patent application. Elk Corp. of Dallas v. GAF Bldg. Materials Corp., 168 F.3d 28, 30 (Fed. Cir. 1999). A breach of this duty constitutes inequitable conduct. Mollins, 48 F.3d at 1178. If it is established that a patent applicant engaged in inequitable conduct, then the patent application is rendered unenforceable. Kingsdown Med, Consultants v. Hollister Inc., 863 F.2d 867, 877 (Fed. Cir. 1988).

In order to establish unenforceability based on inequitable conduct, a defendant must establish, by clear and convincing evidence, that: (1) the omitted or false information was material to patentability of the invention; or (2) the applicant had knowledge of the

28

existence and materiality of the information; and (3) the applicant intended to deceive the PTO. Mollins, 48 F.3d at 1178. A determination of inequitable conduct, therefore, entails a two step analysis. First, the court must determine whether the withheld information meets a threshold level of materiality. A reference is considered material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. Allied Colloids, Inc. v. Am. Cyanamid Co., 64 F.3d 1570, 1578 (Fed. Cir. 1995) (citations omitted). A reference, however, does not have to render the claimed invention unpatentable or invalid to be material. Merck v. Danbury Pharmacal, 873 F.2d 1418, 1420-21 (Fed. Cir. 1989).

After determining that the applicant withheld material information, the court must then decide whether the applicant acted with the requisite level of intent to mislead the PTO. See Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1327 (Fed. Cir. 2009); Baxter Int'l, Inc. V. McGaw Inc., 149 F.3d 1321, 1327 (Fed. Cir. 1998). "Intent to deceive cannot be inferred solely from the fact that information was not disclosed; there must be a factual basis for finding a deceptive intent." Herbert v. Lisle Corp., 99 F.3d 1109, 1116 (Fed. Cir. 1996). That is, "the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." Kingsdown, 863 F.2d at 876 (Fed. Cir. 1988). Evidence of specific intent must "be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement." Star Sci., Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008). A "smoking gun," however, is not required in order to establish an intent to deceive. See Merck, 873 F.2d at 1422.

In this case, Humanscale bases its inequitable conduct argument on one alleged misdirection and one alleged omission. CompX's patent attorney Nelson misdirected the PTO, Humanscale believes, by stating that the Briggs, Lemon, and Aeschliman Patents were "substantially cumulative . . . in that they all teach various adjustable support mechanisms or parallelogram linkage support mechanisms." Humanscale also asserts CompX acted inequitably by omitting from the September IDS one patent, specifically U.S. Patent 4,644,875, that had been listed in an International Search Report as a "Category X" reference, which is defined as a "document of particular relevance; the claimed invention cannot be considered novel or cannot be considered to involve an inventive step." Humanscale maintains that these two instances involved material information that was hidden or omitted with an intent to deceive.

The Court sees no reason to alter its previous decision granting CompX's Motion for Judgement as a Matter of Law on Humanscale's inequitable conduct defense. Humanscale failed to present sufficient evidence for a reasonable jury to find by clear and convincing evidence that CompX misled or omitted material information from the examiner during the prosecution of the '767 Patent. As to Humanscale's argument about the Briggs, Lemon, and Aeschliman Patents, the record fails to support the conclusion that Nelson misled the PTO into thinking that these references disclosed parallelogram linkage support mechanisms. Instead, the IDS stated that the references listed on the Form PTO-1449 were "substantially cumulative . . . in that they all teach various adjustable support mechanisms or parallelogram linkage support mechanisms." The Briggs, Lemon, and Aeschliman Patents in fact do " teach various adjustable support mechanisms." Nothing about this scenario

convincingly proves that when the examiner then initialed each of these references as having been reviewed that the examiner had been misled to believe that the patents were any more or less relevant than the other patents cited on the Form.   Moreover, a physical copy of the Aeschliman Patent appears in the certified file wrapper of the '767 Patent and all three patents at issue are expressly referenced on the face of the '767 Patent.

Similarly, Humanscale's omission argument is misguided.  The International Search Report listed four foreign references and eight U.S. references.  Those four references were included in the IDS section entitled "Concise Explanation of Non-English Language Listed References."  The Watts Patent, U.S. Patent 4,644,875, was not mentioned in that section for the obvious reason that it is not a foreign reference.  Despite not being mentioned in that section, the '875 Patent and the ISR were disclosed on the Form PTO-1449 (and initialed as reviewed by the examiner) and copies of those documents physically appear in the certified file history of the '767 Patent.  Humanscale's expert witness, Dr. Pratt, was offered to testify as to the materiality of these references, however, he could not refute the legal presumption that when the examiner initialed the references in this case, that the examiner properly performed his duties.  As a result, the examiner had and reviewed the patents discussed above.  On this record, no reasonable juror could find by clear and convincing evidence that any material information was omitted or misleadingly referenced in connection with the '767 Patent.

The inequitable conduct claim additionally fails for lack of an intent to deceive.  In the many contexts in which the issue of an individual's intent is relevant, courts routinely evaluate circumstantial evidence to gauge that individual's state of mind.  The "smoking

gun" is indeed rare. Nevertheless, to establish the requisite deceptive intent, "the involved

conduct, viewed in light of all the evidence, including evidence indicative of good faith,

must indicate sufficient culpability to require a finding of intent to deceive." Kingsdown

Medical Consultants v. Hollister, Inc., 863 F.2d 867, 876 (Fed. Cir. 1988). Notwithstanding

the conclusions above, the closest Humanscale gets to deceptive conduct in connection

with material information is its argument concerning the Watts patent which is referred to

as particularly relevant in the International Search Report, but is then placed by CompX

among the hundreds of references provided in the IDS. Inequitable conduct, however,

requires the intent to deceive, not merely the intent to withhold. Dayco Prods., Inc. v. Total

Containment, Inc., 329 F.3d 1358, 1367 (Fed. Cir. 2003). Showing an intent to deceive

requires "independent evidence." See Cohesive Tech. Inc. v. Waters Corp., 543 F.3d 1351,

1366 (Fed. Cir. 2008). Although intent can, as stated above, be inferred from

circumstantial evidence, that inference cannot be simply that there is an absence of good

faith, Larson Mfg. Co. v. Aluminart Prods. Ltd., 559 F.3d 1317, 1341 (Fed. Cir. 2009), but it

must be the "single most reasonable inference" to be drawn from the evidence, Star

Scientific, Inc. v. R.J. Reynolds Tobacco Co., 537 F.3d 1357, 1366 (Fed. Cir. 2008). Viewed

through that lens, Humanscale has not succeeded in establishing by clear and convincing

evidence that any actions or omissions during the prosecution of the '767 Patent were

done with an intent to deceive. Humanscale may have wanted CompX to draw more

attention to the Watts Patent or to characterize the Briggs, Lemon, and Aeschliman Patents

differently, however, these arguments do not show deceptive intent. Conjecture as to the

possible intentions that perhaps entered the minds of CompX's patent attorneys during the

prosecution of the '767 Patent is not the sort of clear and convincing circumstantial evidence that can establish an inequitable conduct claim.

### ii. Equitable Estoppel

To benefit from the defense of equitable estoppel, a party must show that (1) the actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence; (2) the other party relied upon that communication; and (3) the other party would be materially harmed if the actor is later permitted to assert any claim inconsistent with its earlier conduct.  Aukerman, 960 F.2d at 1041.  Like laches, this defense is committed to the discretion of the trial court.  Id.

Humanscale contends that each of those elements has been proven in this case.  As to the first element, Humanscale notes that CompX sued Humanscale in 1999 and then dropped the suit, which Humanscale interprets as conduct supporting Humanscale's belief that it can continue its business unmolested.   In Humanscale's view, CompX dropped its claims without securing any guarantee from Humanscale to cease its sales of the infringing products.  As in Aukerman, Humanscale says that the nine year delay "favors drawing the inference because the longer the delay, the stronger the inference becomes."  Aukerman, 960 F.2d at 1044; see also 6-19 Chisum on Patents, § 19.05[3][b] ("courts will find an estoppel if the patent owner threatens vigorous enforcement of the patent and then unreasonably delays filing suit").

Humanscale states that the second element has also been satisfied because, as Humanscale's CEO Robert King testified, Humanscale interpreted the nine year delay and CompX's decision to drop its case against Humanscale as evidence that CompX would no

longer pursue the case and, as a result, Humanscale relied on that belief by expanding its use of the accused products and by forgoing the ability to easily switch to a non-infringing product. This same evidence, Humanscale claims, also supports the third element of equitable estoppel by demonstrating that the amount of damages it now may owe are the direct result of CompX's decision to delay filing suit for nine years. Therefore, Humanscale contends that judgment as a matter of law should not have been entered on its equitable estoppel defense.

The Court finds that no reasonable juror could have found that Humanscale had shown that it relied on CompX's alleged inaction. After CompX sued it in 1999, Humanscale never changed its business course, but rather decided to continue selling similar products for years. Humanscale's business and legal judgment, not CompX's acquiescence, drove Humanscale to sell the products it did. See Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp., 60 F.3d 770, 776 (Fed. Cir. 1995) ("Infanti did not establish that he would have acted differently under other circumstances. Indeed, as noted above, Infanti ignored Gasser's charges of infringement because he believed the patent was invalid. Thus, Infanti totally failed to show that he acted in reliance on supposed actions of Gasser rather than a business judgment.") Moreover, as explained in the laches discussion of prejudice, supra, Humanscale was unable to show that it has been materially harmed by CompX's suit. Therefore, the Court declines to change its decision granting CompX's JMOL on Humanscale's equitable estoppel defense.

### iii. Inventorship Defense

Humanscale claims that the record at trial showed that the patents-in-suit are

invalid because one of the inventors was not listed on the patents. An individual must be listed as an inventor when that person makes a contribution that is not "insignificant in quality." See Cook Biotech, Inc. v. Acell, Inc., 460 F.3d 1365, 1373 (Fed. Cir. 2006). As discussed in Humanscale's laches motion, it believes that when Dale McConnell stated in a memo describing the 6100 series prototype that the linkage plate was "Bud's solution," that McConnell acknowledged that Bud Remick solved a design problem by enabling the product to have a single lower linkage plate instead of separate lower linkage arms. Humanscale points out that this solution is represented in one of the '054 Patent's claims stating that the "improved platform support mechanism of claim 1 wherein the first connecting arm comprises a pair of spaced parallel arms and said second connecting arm comprises a single arm intermediate the parallel arms." This shows, according to Humanscale, that Remick contributed to the invention in a not insignificant manner and the issue should have been submitted to the jury.

Humanscale's argument is not supported by the record. A patent is presumed valid. 35 U.S.C. § 282. Similarly, a patent's inventors are presumed to be the true and only inventors. Hess v. Advanced Cardiovascular Sys., Inc., 106 F.3d 976, 980 (Fed. Cir. 1997). The burden of showing misjoinder or nonjoinder of inventors is a heavy one and must be proved by clear and convincing evidence. Id. The evidence at trial could yield only one result—Remick was not an unnamed inventor.

The issue of joint inventorship is governed by 35 U.S.C. § 116, which states, in relevant part:

> When an invention is made by two or more persons jointly, they shall
> apply for patent jointly and each make the required oath, except as

otherwise provided in this title. Inventors may apply for a patent jointly even though (1) they did not physically work together or at the same time, (2) each did not make the same type or amount of contribution, or (3) each did not make a contribution to the subject matter of every claim of the patent.

Although there is no set quantum of contribution required to be considered a joint inventor, a joint inventor "must contribute in some significant manner to the conception of the invention." Fina Oil and Chemical Co. v. Ewen, 123 F.3d 1466, 1473 (Fed. Cir. 1997). This contribution must be proven with corroborating evidence. Id. at 1474.

Humanscale did not create a triable issue as to whether Remick is an inventor of either patent-in-suit. The evidence established that the alleged "solution" that Remick provided was not an inventive step, but merely a draftsman using the skills ordinarily expected of draftsman. As explained in Shatterproof Glass Corp. v. Libbey-Owens Ford Co., 758 F.2d 613, 624 (Fed. Cir. 1985), "an inventor may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent." Moreover, even if Remick's actions were considered inventive, McConnell had already conceived of a singular lower linkage plate nearly two years before Remick offered his "solution" to the issue (PTX016), and testified that Remick's recommendation concerned the design of the linkage plate, not the creation of a linkage plate. (Trial Tr. 117:4-118:4.) Humanscale presented no conflicting, let alone corroborating, evidence to create a dispute on this issue.

**2. New Trial on Damages**

To grant a new trial, the Court must conclude that the jury's verdict was against the clear weight of the evidence. Jackson v. City of Albuquerque, 890 F.2d 225, 231 (10th Cir.

1989).  Here, Humanscale asserts that standard has been met because it is clear that the jury made a mathematical error when calculating its damages award.  In finding that the patents-in-suit had been infringed, the jury awarded $17,220,00 as a reasonable royalty for the period from March 27, 2003 to March 27, 2009, $2,152,500 as a reasonably royalty for the period from March 27, 2009 to December 31, 2009, and a 6% royalty rate from January 1, 2010 until the end of the life of the patents on June 13, 2010.  Based on those figures and CompX's expert Richard Troxel's evaluation of Humanscale's profits from infringing sales, Humanscale calculates that the "effective royalty rates" are as follows: a 6.5% royalty rate for the period from March 27, 2003 to March 27, 2009, a 9.7% royalty rate for the period from March 27, 2009 to December 31, 2009, and a 6% royalty rate from January 1, 2010 until the end of the life of the patents on June 13, 2010.[3]  (Humanscale Memo. 12.) Humanscale's main contention is not with any one rate, but with the fact that there is a difference between the rates.  It argues that although the parties' experts came to different conclusions as to what the royalty rate should be, both experts agreed that the same royalty rate should be applied to the March 27, 2003 to March 27, 2009 period and the March 27, 2009 to December 31, 2009 period.  Neither expert, Humanscale notes, asserted that the March 2009 to December 2009 rate should be any different, much less 50% higher,

---

[3] Humanscale arrives at these rates by accepting CompX's experts reporting of Humanscale's total sales and working backward using the jury's damages awards.  Troxel concluded that Humanscale had sold $265,199,890 in infringing products from March 27, 2003 until March 27, 2009.  For that period, the jury awarded a reasonable royalty of $17,220,000, which then, as Humanscale reports, equals a royalty rate of 6.5%.  For the March 27, 2009 to December 31, 2009 period, Troxel stated Humanscale had sold $22,204,039 in infringing products.  For that period, the jury awarded a royalty of $2,152,500, which then equals a royalty rate of 9.7%.

than the rate for the six year damages period available under 35 U.S.C. § 286. Because damages must be carefully tied to the proof of harm and because the evidence presented at trial showed that Humanscale's sales varied from year to year, the jury's rote application of the same amount of damages for every calender quarter was, Humanscale contends, contrary to law and, accordingly, necessitates a new trial on damages.

CompX asserts that no new trial is needed. The jury was free to pick its own royalty rates as long as those rates were reasonably accurate. See Fuji Photo Film Co. v. Jazz Photo Corp., 394 F.3d 1368, 1378 (Fed. Cir. 2005); Thompson v. Brotherhood of Sleeping Car Porters, 367 F.2d 489, 493 (4th Cir. 1966). CompX contends that Humanscale's calculations are just an attempt to manufacture a discrepancy. Using its understanding of the damages award, CompX says the award is precise and uses a rate that is within the range suggested by the experts for both parties. CompX interprets the award as establishing a royalty rate of 6.7%, which it calculated by dividing the total jury award of $19,372,500 by the total damage amount of $287,403,929. Then to arrive at how the jury divided the total award the way it did, CompX explains that the entire damages period covers 27 calender quarters and therefore CompX suffered $717,500 in damages per quarter ($19,372,500/27 = $717,500). As a result, the jury properly awarded $17,220,000 for the 24 quarters covering March 27, 2003 to March 27, 2009 ($717,500 x 24 = $17,220,000) and $2,152,500 for the 3 remaining quarters covering March 27, 2009 until December 31, 2009 ($717,500 x 3 = $2,152,500). Based on that understanding of the damages award, CompX asks the Court to reject Humanscale's request.

The Court DENIES the Motion for a New Trial on Damages. Humanscale's argument

does not focus on what the royalty rate should have been, but rather that there should not have been a different royalty rate between the March 27, 2003 to March 27, 2009 period and the March 27, 2009 to December 31, 2009 period. It makes this argument by taking a view of the award that results in different royalty rates between the relevant time periods. Humanscale's interpretation of how the jury arrived at its award is, however, not the only method one could use to understand what the jury did. As CompX explained, the jury could have established its preferred royalty rate, applied that rate to the total profits, and then broken out that amount by the time periods dictated by the two damages questions on the verdict form. CompX's explanation is supported by the record and does not necessitate a new trial. Moreover, even if the Court were inclined to entertain Humanscale's interpretation of the damages award, it would not require a new trial on damages. The Federal Circuit has held that a jury's determination of a reasonable royalty "simply must be within the range encompassed by the record as a whole." See Unisplay, S.A. v. Am. Elec. Sign Co., Inc., 69 F.3d 512, 519 (Fed. Cir. 1995). The royalties established by the jury, as Humanscale calculates them to be, were indeed within the ranges both parties' experts provided. Under either CompX or Humanscale's interpretation, the jury's damages award is supported by the record and is not against the great weight of the evidence. The Motion is DENIED.

### III. CONCLUSION

For the foregoing reasons, the Court DENIES the Motions.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.  An appropriate order will issue.

It is SO ORDERED.

_____/s/_____
James R. Spencer
Chief United States District Judge

ENTERED this  16th   day of August 2010